IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| KATHERINE LEE, | ) |
|---|---|
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 05-418J |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Katherine Lee, seeks judicial review of a
decision of defendant, Jo Anne B. Barnhart, Commissioner of
Social Security ("the Commissioner"), denying her applications
for disability insurance benefits ("DIB") and supplemental
security income ("SSI") under Titles II and XVI, respectively, of
the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.
Presently before the Court are the parties' cross-motions for
summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons
set forth below, plaintiff's motion for summary judgment will be
granted, and the Commissioner's cross-motion for summary judgment
will be denied

1

## II. Background

### A. Procedural History

Plaintiff protectively filed applications for DIB and SSI on October 14, 2003, alleging disability since January 31, 2002 due to schizoaffective disorder and character disorder.[1]  (R. 64-66, 72, 255-56).  After review, plaintiff's applications were denied by the Social Security Administration (R. 37-38, 39-43, 257, 258-62), and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 44).

A hearing was held before ALJ John J. Mulrooney, II on March 30, 2005.  Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified at the hearing.  (R. 265-305). On May 13, 2005, the ALJ issued a decision denying plaintiff's applications for DIB and SSI.  Specifically, the ALJ concluded that, although plaintiff suffers from severe mental impairments, an award of Social Security benefits was prohibited because

---

[1]In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

2

plaintiff's abuse of drugs and alcohol was a contributing factor
material to the determination of disability.  (R. 14-28).

Plaintiff's request for review of the ALJ's decision was
denied by the Appeals Council on September 16, 2005.  (R. 6-8,
10).  This appeal followed.

## B. Facts

Plaintiff's testimony at the hearing before the ALJ on March
30, 2005 may be summarized as follows:[2]

Plaintiff, who lives alone in Clearfield, Pennsylvania, is
divorced.  Her parents, who reside in Maryland, have custody of
her son.[3]  (R. 270-72).  Plaintiff was last employed as a
cleaning person by M&M Janitorial.  The job, which was not
steady, lasted only "a month if that" due to a dispute over pay.[4]
(R. 273-76).  Plaintiff also has been employed in the past as an
electrician.[5]  (R. 299).

---

[2]Plaintiff's date of birth is September 23, 1967.  (R. 255).
She was 37 years old on the date of the hearing before the ALJ.
Plaintiff has a high school education.  She also has taken
courses in drafting, accounting and electrical work at a
community college.  (R. 78).

[3]At the time of the hearing, plaintiff's son was 9 years
old.

[4]In his decision, the ALJ characterized this employment as
an unsuccessful work attempt.  (R. 16).

[5]According to information provided by plaintiff to the
Social Security Administration, she also has worked as a
bookkeeper in the past.  (R. 73).

With respect to her diagnoses of schizophrenia and schizoaffective disorder, plaintiff hears voices "all the time" which tell her things like she is "some messiah type person with all these special powers..." and her "parents are trying to hurt [her] son...."  (R. 276-78).  Plaintiff's medications help her mental disorders and the voices "to an extent."  (R. 279). Plaintiff was hospitalized in Maryland in 2001 and in Florida and Pennsylvania in 2002.  After the hospitalization in Pennsylvania in September, 2002, plaintiff was sent to Twin Lakes; however, she cannot remember the reason for being sent to Twin Lakes.[6] (R. 291-92).

Plaintiff attends group counseling sessions on occasion, and she sees a doctor every other month for medication monitoring. (R. 296-97).  Plaintiff remembers attempting suicide on 5 occasions.[7]  On some of these occasions, plaintiff took drug overdoses.  (R. 295).  Plaintiff's mental illness, which plaintiff believes began when she was a child, affects her ability to remember "chunks" of her life, including the time she spent in Florida.  (R. 281-82).

---

[6]Twin Lakes Center provides drug and alcohol rehabilitation. (R. 131).

[7]According to plaintiff, she has been told by other people that she has attempted suicide on many more occasions than she remembers.  (R. 295).

4

Plaintiff has a history of cocaine, heroin and marijuana abuse. Although plaintiff denies a history of alcohol abuse, she attends AA meetings "[a]s often as [she] can."[8]  (R. 282-84). Plaintiff completed a term of probation shortly before the hearing.[9]  While she was on probation, plaintiff was tested periodically for drugs and alcohol; however, she never tested positive for any prohibited substances.  (R. 286).

With regard to activities of daily living, plaintiff has a driver's license and she drives.  Plaintiff maintains her house and she can do her own shopping.  Plaintiff watches television and she reads newspapers, magazines and books.  Plaintiff does not belong to any clubs; however, she occasionally attends a friend's church.  As to hobbies, plaintiff likes to draw.[10]  (R. 287-91).

---

[8]When asked what she meant by her response, plaintiff testified that she preferred the AA meetings in Maryland to the AA meetings in Pennsylvania where she was residing.  Therefore, when she went to her parents' home in Maryland to visit her son, plaintiff attended AA meetings.  (R. 284).

[9]Plaintiff was sentenced to a term of probation in connection with an arrest for possession of heroin in the fall of 2003.  According to plaintiff, she had been "clean" for 18 months before this incident, which she characterized as a "relapse," and she has been "clean" since the arrest.  (R. 293-94).

[10]With respect to the frequency of plaintiff's drawing, she testified as follows: "... sometimes I'll sit down and draw and then I'll go a long period where I can't do it."  (R. 290).

5

## C. Evidence in the Record

The administrative record in this case contains the following evidence:

### 1. Records of Frederick Memorial Hospital - 6/8/99 to 6/10/99

On June 8, 1999, plaintiff was admitted to Frederick Memorial Hospital in Frederick, Maryland after being found unresponsive. According to her father, plaintiff was "somewhat despondent about her life situation." Plaintiff was discharged from the hospital on June 10, 1999 with a diagnosis of tricyclic (antidepressant) overdose. (R. 111-13).

### 2. Records of Frederick Memorial Hospital - 5/22/01 to 5/23/01

On May 22, 2001, plaintiff was seen in the emergency department of Frederick Memorial Hospital. At the time, she was drowsy and only responded to painful stimuli. According to plaintiff's mother and girlfriend, plaintiff was upset about a relationship and wanted to kill herself. Plaintiff's mother reported that plaintiff had been using cocaine, but she denied any IV use of illicit drugs or alcohol abuse by plaintiff. Plaintiff was admitted to the hospital with the following diagnosis: "Overdose of cocaine, Elavil, and Xanax, possible suicidal ideation." She was discharged the next day with information about drug rehabilitation programs. Plaintiff's

6

discharge diagnoses were polysubstance abuse and depression.   (R. 116-20).

**3.  Records of South Bay Hospital - 8/3/02 to 8/8/02**

On August 3, 2002, plaintiff was found lying on the side of the road in Hillsborough County, Florida.  Although plaintiff was initially talking when found, she became unresponsive at the scene.  Plaintiff was transported to South Bay Hospital by ambulance.  Due to combative behavior, she was placed in restraints.[11]  Testing revealed that plaintiff's alcohol level was "minimal" and her drug screen was negative.  Plaintiff's diagnoses upon admission included Altered Mental Status and Possible Schizophrenia.  (R. 228-31).

On August 6, 2002, plaintiff was evaluated by a psychiatrist. Plaintiff was "unsure" of her past medical and social history, stating that she could not remember "anything."  Because plaintiff's mental status examination indicated that she had improved since being brought to the hospital, the doctor declined to prescribe any psychotropic medications, recommending that plaintiff be transferred to a psychiatric hospital for further evaluation after she was cleared medically.  (R. 235-36). Plaintiff was discharged from South Bay Hospital on August 8,

---

[11]At one point after being taken to South Bay Hospital, while a nurse was bathing her, plaintiff stated that she was Jewish and instructed the nurse not to wash her feet because "only my Jewish friends can do it."  (R. 232).

7

.  ,

.

2002, and transferred to another facility called "Baylife."[12]
(R. 231).

**4.  Records of UPMC Bedford Memorial Hospital - 9/11/02**

On September 11, 2002, plaintiff was taken to the emergency
room of UPMC Bedford Memorial Hospital by her parents due to
delusional thoughts, *i.e.*, plaintiff believed she was the
Messiah.  Plaintiff's blood work was negative for drugs.  She was
given several medications and referred to Somerset Hospital.  (R.
211-12).

**5.  Records of Somerset Hospital - 9/11/02 to 9/17/02**

On September 11, 2002, plaintiff was admitted to Somerset
Hospital on an involuntary basis for "psychosis and agitated
behavior."  At the time of admission, plaintiff denied drug and
alcohol abuse but claimed that she was "the Messiah."[13]  With
respect to her past psychiatric history, plaintiff reported many
suicide attempts "either by cutting her wrists or by taking pills
or trying to kill herself with street drugs."  Plaintiff also

---

[12]Plaintiff was unable to obtain the records of this
subsequent hospitalization due to the name that was placed on her
chart at South Bay Hospital as a result of the fact that she was
unresponsive when transported to the hospital, i.e., Kathy Wilson
rather than Katherine Lee.  (R. 227-54, 276).

[13]According to the hospital's intake records, plaintiff
reported that she has "a mission from God and is advised of this
mission through the animals and trees communicating with her."
Plaintiff also claimed that "the whole county calls her Messiah
in Tampa, Florida;" that she "can make it rain" and that she "can
make the wind blow."  (R. 126).

8

reported that she has no problems with alcohol, but that she has done practically every kind of drug; that, although she likes to snort heroin, her drug of choice is crack cocaine; and that she had not used crack cocaine since January or snorted heroin since the previous year. The attending physician's impression was "Depressive disorder with suicidal ideation," and she rated plaintiff's score on the Global Assessment of Functioning ("GAF") Scale as 30.[14]  While in the hospital, plaintiff requested a drug and alcohol evaluation. On September 17, 2002, plaintiff was discharged to Twin Lakes, a drug and alcohol rehabilitation center.[15]  (R. 123-30).

---

[14]The GAF Scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health - illness and is used by clinicians to report an individual's overall level of functioning.  The highest possible score is 100 and the lowest is 1.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), p. 32.

A GAF score between 21 and 30 denotes the following: **"Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends)." DSM-IV, p. 32.

[15]At the time of discharge, plaintiff's GAF score was rated a 72.  A GAF score between 71 and 80 denotes the following: **"If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficulty concentrating after family argument); **no more than slight impairment in social, occupational, or school functioning** (e.g., temporarily falling behind in schoolwork)."  DSM-IV, p. 32.

9

**6.  Report of Twin Lakes Center - 9/17/02 to 8/5/03**

The Pennsylvania Bureau of Disability Determination
requested information from Twin Lakes Center regarding
plaintiff's treatment following her discharge from Somerset
Hospital on September 17, 2002.  The letter, which was prepared
by the center's Clinical Director, indicates that plaintiff's
diagnosis was "Opiate/Alcohol/Cannabis Abuse;" that plaintiff
gained knowledge about her disease during inpatient treatment and
committed herself to working the 12 Steps of Recovery; that
plaintiff was discharged from inpatient treatment on October 15,
2002; that following her discharge from inpatient treatment,
plaintiff successfully completed the center's outpatient program
on August 5, 2003; and that plaintiff's prognosis was guarded.
(R. 131).

**7.  Records of Bedford-Somerset MH/MR - 10/22/02 to 8/4/03**

On October 22, 2002, following her discharge from inpatient
treatment at Twin Lakes Center, plaintiff presented to Bedford-
Somerset MH/MR requesting a doctor, individual counseling and
involvement in the agency's Partial Hospitalization Program.
During the initial evaluation, plaintiff denied current drug or
alcohol abuse, stating that she had been "clean" since January,
2002.  Plaintiff was referred to a staff psychiatrist for
evaluation, treatment recommendations and possible medication
management.  She also was referred to the Clinical Services Unit

10

and the Partial Hospitalization Program for therapeutic
intervention.  (R. 135-37).

On December 13, 2002, plaintiff was evaluated by Dr. Edward
M. Lipski, a staff psychiatrist.  During the evaluation,
plaintiff denied alcohol abuse and reported that her last use of
illicit substances occurred prior to her last psychiatric
hospitalization.  Dr. Lipski's diagnostic impression included
schizoaffective disorder, polysubstance disorder, character
disorder and situational and personal concerns.  He rated
plaintiff's GAF score as 55,[16] and gave her prescriptions for
Risperdal, Klonopin and Elavil.[17]  (R. 143-44).

When plaintiff saw Dr. Lipski on February 5, 2003, she
claimed to be taking her psychotropic medication as prescribed;
she denied any active psychotic symptoms; and she claimed
continued avoidance of alcohol and illicit substances.  (R. 142).
During her appointment with Dr. Lipski on June 4, 2003, plaintiff
reported continued benefit from the psychotropic medication,

---

[16]A GAF score between 51 and 60 denotes the following:
**"Moderate symptoms** (e.g., flat affect and circumstantial speech,
occasional panic attacks) **OR moderate difficulty in social,
occupational or school functioning** (e.g., few friends, conflicts
with peers or co-workers).  DSM-IV, p. 32.

[17]Risperdal is prescribed to treat the symptoms of psychotic
disorders, such as schizophrenia.  Klonopin is prescribed to
relieve anxiety, and Elavil is a tricyclic antidepressant
prescribed to relieve mental depression.  See www.nlm.nih.gov/
medlineplus/druginfo.

11

although situational, personal and somatic issues had become sources of concern. (R. 142). During her appointment with Dr. Lipski on August 4, 2003, plaintiff claimed continued avoidance of alcohol and illicit substances, but she reported numerous sources of stress and experiencing emotional distress on a reactive basis. (R. 141).

## 8. Employability Assessment Form - 9/26/03

In an employability assessment form prepared for the Pennsylvania Department of Public Welfare on September 26, 2003, Dr. Lipski indicated that plaintiff's primary and secondary diagnoses were schizoaffective disorder and character disorder, respectively; that plaintiff became temporarily disabled as a result of her illnesses on December 13, 2002; and that plaintiff's temporary disability was expected to last until October 1, 2004. (R. 132-33).

## 9. Records of Bedford-Somerset MH/MR - 10/22/03

During her appointment with Dr. Lipski on October 22, 2003, plaintiff claimed to be taking her psychotropic medication regularly as prescribed, and she reported no difficulty with tolerance. Plaintiff also reported continued avoidance of drugs and alcohol and no life stresses or concerns. Dr. Lipski noted that plaintiff was appropriate and relevant with no apparent active psychotic or mood disturbances. (R. 140).

12

**10.   Records of UPMC Bedford Memorial Hospital - 10/30/03**

Plaintiff went to the emergency department of UPMC Bedford
Memorial Hospital on October 30, 2003 because she could not stop
crying and could feel herself "becoming disconnected." Plaintiff
claimed that her medications were not helping, and that, when she
attempted to contact her psychiatrist at Bedford-Somerset MH/MR,
a crisis worker returned her call and instructed her "to just
continue her medications as previously prescribed." When
plaintiff did not accept this answer, she was referred to the
emergency department. Because plaintiff was not in acute
distress and appeared to be stable, she was instructed to see the
crisis worker at Bedford-Somerset MH/MR the next day. During
plaintiff's assessment by the nurse in the emergency department,
plaintiff indicated that she had used heroin the previous week.
(R. 220-26).

**11.   Discharge Summary of Bedford-Somerset MH/MR Clinical
Services Unit - 2/6/04**

Plaintiff was discharged from the Clinical Services Unit
of Bedford-Somerset MH/MR on February 6, 2004 because she
declined further treatment. The discharge summary indicates that
plaintiff attended 8 sessions between November 6, 2002 and
September 23, 2003, and that she canceled on 3 occasions and
missed 1 appointment. The discharge summary further indicates
that plaintiff appeared to make "modest progress" in treatment;

13

that plaintiff appeared to refrain from the use of illicit substances; and that plaintiff reported abstinence from alcohol, "but implied otherwise." Plaintiff's discharge diagnoses were schizoaffective disorder and polysubstance dependence, and her GAF score was rated a 45.[18] Plaintiff's status was described as unchanged, and her prognosis was listed as guarded. (R. 207, 209).

## 12. Notes of Dr. Lipski - 3/3/04

Plaintiff saw Dr. Lipski for a medication check on March 3, 2004, reporting dissatisfaction with her current medications. Dr. Lipski described plaintiff as follows: "Her mood was subdued, but her affect was emotionally intense. She was angry with a negative attitude." Dr. Lipski changed plaintiff's medications, and she accepted his offer to participate in Bedford-Somerset MH/MR's Group Counseling Center. Dr. Lipski rated plaintiff's GAF score as 45. (R. 208). Plaintiff canceled her next appointment with Dr. Lipski for a medication check, which had been scheduled for May 12, 2004, indicating that she did not wish to reschedule. (R. 208).

---

[18]A GAF score between 41 and 50 denotes the following: "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). DSM-IV, p. 32.

14

**13.   Notes of Dr. V.K. Suresh Rajan - 5/19/04 to 10/6/04**

On May 19, 2004, plaintiff met with Dr. V.K. Suresh Rajan, another psychiatrist at Bedford-Somerset MH/MR, for medication review.[19]  Dr. Rajan noted that plaintiff's mood was anxious, her affect was flat, she seemed paranoid and her judgment and insight were compromised.  Dr. Rajan made some changes in plaintiff's medications, described her prognosis as guarded, and rated her GAF score as 40.[20]  (R. 206).

Plaintiff's next appointment with Dr. Rajan for medication review took place on June 23, 2004.  Dr. Rajan noted that plaintiff "seem[ed] to be doing a lot better."  Again, Dr. Rajan described plaintiff's prognosis as guarded, and he rated her GAF score as 45.  (R. 206).  Plaintiff's next appointment with Dr. Rajan for medication review took place on August 11, 2004.  Dr. Rajan noted that plaintiff was doing "fairly well."  Plaintiff had been taking her medications and reported no side effects.

---

[19]Dr. Rajan's notes indicate that plaintiff became very unhappy with Dr. Lipski during her last appointment with him, and that, as a result, she requested medication monitoring by another psychiatrist at the center.  (R. 206).

[20]A GAF score between 31 and 40 denotes the following: **"Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school). DSM-IV, p. 32.

15

Although plaintiff remained "a little grandiose," she denied any hallucinations. Again, Dr. Rajan described plaintiff's prognosis as guarded, and he rated her GAF score as 40. The last notes of Dr. Rajan in the record indicate that plaintiff canceled her October 6, 2004 appointment, but that she made another appointment for November 3, 2004. (R. 205).

## 14. Report of Consultative Psychiatric Evaluation by William C. Ryan, M.D. - 4/27/04

On March 23, 2004, plaintiff underwent a psychiatric evaluation by Dr. William C. Ryan at the request of the Pennsylvania Bureau of Disability Determination.[21] In his

---

[21]In connection with his evaluation of plaintiff, Dr. Ryan was provided with the following documents:

1. The discharge summary from Frederick Memorial Hospital relating to plaintiff's admission in May, 2001 for an overdose of cocaine, Elavil and Xanax;
2. The report of plaintiff's initial psychiatric evaluation by Bedford-Somerset MH/MR on October 22, 2002; and
3. The report of plaintiff's psychiatric evaluation by Dr. Lipski at Bedford-Somerset MH/MR on December 13, 2002.

(R. 150).

With respect to Dr. Lipski's report concerning plaintiff's psychiatric evaluation on December 13, 2002 which includes a diagnostic impression of schizoaffective disorder, Dr. Ryan stated in his report that Dr. Lipski's "examination findings as to mental status and history fail to support any element of a Schizophrenic characteristic, apart from depressed mood." (R. 150). At the hearing before the ALJ, plaintiff's counsel objected to this statement in Dr. Ryan's report in light of the medical evidence of record. In response, the ALJ stated that plaintiff's diagnoses of schizophrenia and schizoaffective disorder were well-supported in the record and that they were

16

report, Dr. Ryan stated that he did not see plaintiff's assurance about sobriety as genuine in view of her failure to participate in AA meetings on an ongoing basis.  Dr. Ryan opined that plaintiff was fully competent and capable of full-time employment, as well as continued education, if she totally abstained from alcohol and illicit substances.  (R. 150-54).

## III.  Legal Analysis

### A.  Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g) and § 1383(c)(3) (incorporating Section 405(g)), which provide that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance.  Dobrowolsky v. Califano,

---

severe impairments.  The ALJ further stated that the failure of Dr. Ryan to consider these diagnoses would be considered in connection with the weight to be given to his report.  (R. 14-15).

17

606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have

decided the case differently, it must accord deference to the

Commissioner and affirm the findings and decision if supported by

substantial evidence.  Monsour Medical Center v. Heckler, 806

F.2d 1185, 1190-91 (3d Cir.1986).

## B. The 5-Step Sequential Evaluation Process and 42 U.S.C. § 423(d)(2)(C)

In Burnett v. Commissioner of Social Security Admin., 220

F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

an ALJ must follow in evaluating a claim for Social Security

disability benefits, stating in relevant part:

\* \* \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether

18

the claimant retains the residual functional capacity
to perform her past relevant work. 20 C.F.R.
§ 404.1520(d). The claimant bears the burden of
demonstrating an inability to return to her past
relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step. At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability. 20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity. The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

\*    \*    \*

220 F.3d at 118-19.

In the case of a claimant who is determined to be disabled

after application of the five-step sequential evaluation process

but who has medical evidence of drug addiction or alcoholism

("DAA"), such as plaintiff, the ALJ must determine whether DAA is

a contributing factor material to the claimant's disability

pursuant to Section 423(d)(2)(C) of the Social Security Act,

which provides: "An individual shall not be considered to be

disabled for purposes of this subchapter if alcoholism or drug

addiction would (but for this subparagraph) be a contributing

19

factor material to the Commissioner's determination that the individual is disabled."[22]

Under the Social Security regulations governing implementation of Section 423(d)(2)(C), the "key factor" in determining whether a claimant's DAA is a contributing factor material to the claimant's disability is "whether [the Commissioner] would still find [the claimant] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1) (standards for DIB), 416.935(b)(1) (identical standards for SSI). The ALJ must determine which of the claimant's limitations would remain if the claimant stopped using drugs or alcohol. Then, the ALJ must determine whether any of the claimant's remaining limitations would be disabling. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).

If the ALJ determines that the claimant's remaining limitations would not be disabling, the ALJ must find that the claimant's DAA "is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). On the other hand, if the ALJ determines that the claimant's remaining limitations would be disabling, the ALJ must find that the claimant is "disabled independent of [his or

---

[22]Section 423(d)(2)(C) of the Social Security was enacted on March 29, 1996, as part of the Contract with America Advancement Act, Pub.L. No. 104-121, § 105, 110 Stat. 847, 852 (1996), to discourage drug and alcohol abuse.

20

her] drug addiction or alcoholism and ... [his or her] drug
addiction or alcoholism is not a contributing factor material to
the determination of disability." 20 C.F.R.
§§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).

With respect to the ALJ's evaluation of plaintiff's claims
for DIB and SSI in the present case, steps one and two of the
sequential evaluation process were resolved in plaintiff's favor:
that is, based on the record, the ALJ found that plaintiff had
not engaged in substantial gainful activity since her alleged
onset date of January 31, 2002, and that plaintiff suffers from
severe impairments, including a schizoaffective disorder,
schizophrenia, a polysubstance abuse/dependence disorder, a
bipolar disorder, a post-traumatic stress disorder, a character
disorder, a major depressive disorder and a borderline
personality disorder. (R. 16-17).

Turning to step three of the sequential evaluation process,
the ALJ found that plaintiff met the criteria of Listing 12.09
(relating to Substance Addiction Disorders), "as effectuated"
through Listing 12.03 (relating to Schizophrenic, Paranoid and
Other Psychotic Disorders), because plaintiff's impairments
result in "marked" limitations in social functioning and repeated
episodes of decompensation.[23]  (R. 18-19).  In light of the

_____

[23]Listing 12.03 provides in relevant part:

21

foregoing finding, the ALJ next addressed the issue of whether plaintiff's DAA was a contributing factor material to the determination that she was disabled, concluding that plaintiff's limitations in the absence of DAA would cause more than a minimal impact on her ability to perform basic work activities. Therefore, the limitations would continue to be severe, but plaintiff would not have an impairment that met or equaled a

---

12.03 *Schizophrenic, Paranoid and Other Psychotic Disorders:* Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied....

A. Medically documented persistence, either continuous or intermittent, of one or more of the following:

1. Delusions or hallucinations; or

2. Catatonic or other grossly disorganized behavior; or

3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

a. Blunt affect; or

b. Flat affect; or

c. Inappropriate affect; or

4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

\*   \*   \*

20 C.F.R. Pt. 404, Subpt. P, App. 1.

22

Case 3:05-cv-00418-WLS   Document 18   Filed 10/19/06   Page 23 of 34

listed impairment if she stopped using illicit drugs and alcohol.
(R. 19).

Because the ALJ determined that plaintiff no longer met a
listed impairment in the absence of DAA, he proceeded to step
four of the sequential evaluation process and found that
plaintiff can no longer perform her past relevant work because
the jobs were skilled and semi-skilled and, due to her mental
impairments, plaintiff is limited to simple, routine and
repetitive work.  (R. 25).

Finally, at step five of the sequential evaluation process,
based on the testimony of the VE, the ALJ found that plaintiff
was capable of making a successful adjustment to work which
exists in significant numbers in the national economy.  Thus,
plaintiff was not disabled.[24]  (R. 26).

_____

[24]The ALJ asked the VE to assume a hypothetical individual
with plaintiff's past education, training and work experience who
(a) has no lifting or carrying restrictions, (b) is limited to
"simple, routine, repetitive tasks, not performed in a fast-paced
production environment involving only simple work-related
decisions and in general relatively few workplace changes," and
(c) is limited to "no more than occasional interaction with
supervisors, coworkers and members of the general public."  The
ALJ then asked the VE whether there were any jobs in the national
and local economies which the hypothetical person could perform.
The VE responded affirmatively, indicating that the hypothetical
person could perform the following jobs: stock and inventory
clerk, private household cleaner and industrial cleaner.  (R.
302-03).

23

## C. Plaintiff's Argument in Support of Summary Judgment

Plaintiff asserts that the record lacks substantial evidence supporting the ALJ's determination that DAA was a contributing factor material to the finding that she was disabled during the relevant time period, and that, therefore, the ALJ's decision should be reversed and the case remanded for an award of benefits. After consideration, the Court agrees.

In an emergency message to disability adjudicators concerning DAA determinations which consists of a series of questions and answers ("EM-96200"), the Social Security Administration responded to the question of what constitutes sufficient evidence to establish the existence of a substance abuse disorder as follows: "... medical evidence of DAA, *i.e.*, a substance use disorder, will be considered sufficient and appropriate when the evidence shows that the criteria for 'substance dependence' or 'substance abuse' disorders defined in the DSM-IV are fulfilled." (EM-96200, August 30, 1996, Answer 24).

The DSM-IV describes the criteria for "substance dependence" and "substance abuse" as follows:

"The essential feature of Substance Dependence is a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues use of the substance despite significant substance-related problems. There is a pattern of repeated self-administration that usually results in tolerance, withdrawal, and compulsive drug-taking behavior...." (DSM-IV, p. 176).

24

"The essential feature of Substance Abuse is a maladaptive pattern of substance use manifested by recurrent and significant adverse consequences related to the repeated use of substances.... Unlike the criteria for Substance Dependence, the criteria for Substance Abuse do not include tolerance, withdrawal, or a pattern of compulsive use and instead include only the harmful consequences of repeated use...." (DSM-IV, p. 182).

After carefully reviewing the entire record, the Court agrees with plaintiff that the evidence concerning her use of illicit drugs and alcohol after the alleged onset date of disability of January 31, 2002 does not support a finding that DAA was a contributing factor material to the ALJ's determination that plaintiff was disabled at step three of the sequential evaluation process: that is, the record lacks substantial evidence to establish the criteria set forth in the DSM-IV for either "substance dependence" or "substance abuse."

## D. Analysis of the ALJ's DAA Determination

In his decision, the ALJ cites various evidence in the record to support his determination that DAA was a contributing factor material to the finding at step three of the sequential evaluation process that plaintiff was disabled. For the following reasons, the Court concludes that the cited evidence does not constitute substantial evidence supporting the ALJ's DAA determination:

25

i

The ALJ states in his decision that "[t]he evidence demonstrates ... a history of hospitalizations and treatment for drug and alcohol abuse." In support of this statement, the ALJ cites Exhibits 2F, 3F, 4F and 7F. However, none of these exhibits support the ALJ's statement for the relevant time period.

With respect to Exhibit 2F, which is the discharge summary relating to plaintiff's June, 1999 hospitalization for an overdose of antidepressants, this incident preceded plaintiff's alleged onset date of disability by two and one-half years. Moreover, at the time, plaintiff's father reported that plaintiff was despondent about her life situation, and plaintiff was advised to seek psychiatric outpatient services. No recommendations for drug or alcohol rehabilitation were noted.

Turning to Exhibit 3F, which are the records from plaintiff's May, 2001 hospitalization following a suicide attempt, although the overdose of drugs taken by plaintiff included cocaine and plaintiff's mother reported that plaintiff had been using cocaine, this incident occurred over six months before plaintiff's alleged onset date of disability.

As to Exhibit 4F, which consists of the records relating to plaintiff's September, 2002 hospitalization for "psychosis and agitated behavior," plaintiff denied current drug abuse.

Specifically, plaintiff reported that she had not used cocaine since the previous January (the month of her alleged onset of disability), and that she had not used heroin since 2001.  She also denied any problems with alcohol.[25]  In addition, when plaintiff's parents initially took her to the emergency room on September 11, 2002 due to delusional thoughts, plaintiff's blood screen was negative for drugs, and there is no evidence that plaintiff tested positive for the presence of alcohol.  (R. 212).

Finally, regarding Exhibit 7F, which consists of the records of Bedford-Somerset MH/MR relating to the services provided by that facility to plaintiff from October 22, 2002 to October 22, 2003, none of the records support a finding of drug or alcohol abuse during that period.  In fact, the records show that plaintiff denied current use of drugs or alcohol (a) at the time of her initial evaluation on October 22, 2002 (R. 136), (b) during her psychiatric evaluation by Dr. Lipski on December 13, 2002 (R. 143), and (c) during her appointments with Dr. Lipski for medication checks on February 5, 2003, August 4, 2003 and October 22, 2003.   (R. 140-42).

---

[25]In this connection, the Court notes that although plaintiff's mother reported that plaintiff had been using cocaine prior to her suicide attempt and hospitalization in May, 2001, plaintiff's mother denied that plaintiff abused alcohol at the time of that admission (R. 118), corroborating plaintiff's claim in September, 2002 that she did not have any problems with alcohol.

ii

Next, the ALJ states in his decision that plaintiff "has been arrested on numerous occasions for possession of illegal drugs." First, the Court notes that after a thorough review of Exhibit 4E, which the ALJ cites in support of this statement, the Court could find no reference to arrests of plaintiff for drug possession. The Court did find a reference in Exhibit 7F to a statement apparently made by plaintiff during her initial evaluation at Bedford-Somerset MH/MR on October 22, 2002 concerning past arrests for drug possession. However, because the statement does not indicate *when* plaintiff's arrests for drug possession occurred (before or after January 31, 2002 - the alleged onset date of disability), the statement cannot be construed as substantial evidence supporting the ALJ's DAA determination.

iii

The ALJ also relies on plaintiff's August 3, 2002 hospitalization in Florida for an altered mental status to support his DAA determination, noting that plaintiff tested positive for alcohol at the time of her admission. However, this notation is misleading. The hospital records clearly state that plaintiff's alcohol level was "minimal," and there is no indication that alcohol contributed to plaintiff's altered mental status. Moreover, plaintiff's drug screen was completely

28

negative.  Thus, these records do not constitute substantial
evidence supporting the ALJ's DAA determination.

iv

The ALJ also notes that during plaintiff's hospitalization
in September, 2002 for psychosis and agitated behavior, she
requested a drug and alcohol evaluation and was accepted into the
Twin Lakes Center.  However, he fails to mention that the records
relating to this hospitalization indicate that plaintiff's blood
screen was negative for drugs at the time of admission and make
no reference to alcohol.  (R. 19).  Moreover, plaintiff
successfully completed Twin Lakes Center's inpatient program,
which she attended from September 17, 2002 to October 15, 2002,
as well as its outpatient program from which she was discharged
on August 5, 2003.  (R. 131).  In the Court's view, the mere fact
that plaintiff participated in a drug and alcohol rehabilitation
program after her alleged onset date of disability does not
provide substantial evidence supporting the ALJ's DAA
determination in the absence of evidence of repeated drug and/or
alcohol abuse during the relevant time period.

v

The ALJ also notes that on October 30, 2003, when plaintiff
went to the emergency room because "she felt herself becoming
disconnected," plaintiff reported that she had used heroin the
previous week.  There is no evidence, however, to support a

29

finding that plaintiff's heroin use the previous week was part of

"a pattern of repeated self-administration" (Substance

Dependence) or part of "the repeated use of substances"

(Substance Abuse).[26]    Thus, plaintiff's statement regarding the

use of heroin in October, 2003 does not constitute substantial

evidence supporting the ALJ's DAA determination.

vi

Relying on Exhibits 5F and 7F, the ALJ states that

plaintiff's hallucinations and psychotic disturbances are

attributable to drug and alcohol abuse (rather than to her

diagnoses of schizophrenia and schizoaffective disorder).[27]

However, these exhibits do not support the ALJ's statement in

this regard.  Exhibit 5F is merely a summary report of

---

[26]In fact, there is evidence to the contrary.  During the
hearing before the ALJ, plaintiff was questioned about a term of
probation imposed upon her in connection with an arrest for
heroin possession in September or October of 2003.  During her
testimony, plaintiff characterized this incident as a "relapse,"
indicating that she had been "clean" for the 18 months preceding
the incident.  (R. 293-94).  Plaintiff also testified that during
her period of probation, she was subject to urinalyses and that
she never tested positive for illicit substances (R. 286), and
there is no evidence in the record to contradict plaintiff's
testimony in this regard.

[27]In this connection, the ALJ stated in his decision: "...
treatment notes indicate that when the claimant was not using
drugs or alcohol, she denied experiencing hallucinations and did
not experience any psychotic or mood disturbances (Exhibits 5F
and 7F)."  (R. 21).  The ALJ further stated: "... the objective
evidence has indicated that while sober, the claimant does not
experience hallucinations or delusions (Exhibits 5F and 7F)."
(R. 22).

30

plaintiff's treatment at Twin Lakes Center from September 17, 2002 to August 5, 2003 for drug and alcohol abuse. As noted by plaintiff, the report "does not contain any information discussing the question of whether [plaintiff's] psychiatric symptoms continued." (Pl's Brief in Support, p. 8). As to Exhibit 7F, this exhibit consists of the records of Bedford-Somerset MH/MR concerning plaintiff's treatment between October 22, 2002 and October 22, 2003, and Dr. Lipski, who performed plaintiff's psychiatric evaluation at Bedford-Somerset MH/MR on December 13, 2002, stated that plaintiff's "disturbances of thinking, reality contact, and mood" are "complicated by drug abuse," not attributable to drug abuse. Moreover, as noted by plaintiff (Pl's Brief in Support, p. 9), following plaintiff's psychiatric evaluation on December 13, 2002, Dr. Lipski diagnosed plaintiff with schizoaffective disorder, which diagnosis is precluded if an individual's psychotic symptoms are "due to the direct physiological effects of a substance (e.g., cocaine)...." *See* DSM-IV, p. 292.

In addition, the Court notes that Exhibits 4F, 16F and 18F - the records relating to plaintiff's hospitalizations for severe psychotic disturbances in August, 2002 in Florida and September, 2002 in Pennsylvania - clearly refute the ALJ's statement that plaintiff's hallucinations and psychotic disturbances are attributable to drug and alcohol abuse. At the time of her

31

hospital admission in Florida in August, 2002, plaintiff's drug
screen was negative and her alcohol level was "minimal," and at
the time of her hospitalization in Pennsylvania in September,
2002, plaintiff's blood work was negative for drugs and there is
no mention of alcohol.

### vii

Finally, regarding the ALJ's determination that plaintiff
would no longer have marked limitations in social functioning or
repeated episodes of decompensation if she stopped using drugs
and alcohol, and, thus, would no longer meet a 12.00 listing for
a mental impairment (including Listing 12.03 - Schizophrenic,
Paranoid and Other Psychotic Disorders), the ALJ relies, in large
part, on the report of Dr. Ryan which was prepared following his
consultative examination of plaintiff on March 23, 2004.   (R.
19).  However, because Dr. Ryan refused to accept Dr. Lipski's
diagnosis of schizoaffective disorder,[28] Dr. Ryan's opinion

---

[28]A factor in Dr. Ryan's refusal to accept Dr. Lipski's
diagnosis of schizoaffective disorder may have been the limited
medical evidence provided to him.   Inexplicably, Dr. Ryan was not
provided with the records from plaintiff's hospitalizations in
August, 2002 and September, 2002 for psychotic episodes with no
evidence of drug or alcohol abuse.   In this connection, the Court
notes that the ALJ specifically stated in his decision that
plaintiff's diagnoses of schizophrenia and schizoaffective
disorder are "well-supported" by the evidence in the record and
that they are "severe."   As a result, the ALJ indicated that the
failure of Dr. Ryan to consider these diagnoses would be taken
into consideration in determining the weight to be given to his
report.

32

regarding the limitations which would remain if plaintiff stopped using drugs and alcohol necessarily is invalid and does not constitute substantial evidence supporting the ALJ's DAA determination.

## IV.  Conclusion

In the absence of a valid DAA determination, what remains is the ALJ's finding at step three of the sequential evaluation process that plaintiff met the criteria for Listing 12.03 (relating to Schizophrenic, Paranoid and Other Psychotic Disorders) because plaintiff's mental impairments resulted in "marked" limitations in social functioning and repeated episodes of decompensation.[29]  This finding is in accord with the following statements made by the ALJ during the hearing on plaintiff's applications for DIB and SSI:

\*    \*    \*

ALJ: Let me put your mind at ease to a certain extent. I'm going to admit the document but I'm going to tell you right now based on my review of the evidence that schizoaffective disorder has been validly diagnosed in at least three places in the record as has depression and I think she has both of them.  I think they are both severe....

(R. 268).

\*    \*    \*

_____

[29]See Footnote 22.

33

ALJ: All right.  Counsel, do you think your client meets or equals a specific listing?

ATTY: I'm looking at 12.03.

ALJ: Well, let me just tell you that I think your client meets 12.03, and the issue for me is going to be drug and alcohol materiality.  Specifically I think that your client - I think there's (sic) very strong arguments from (sic) marked limits in social functioning and repeated episodes of decompensation.

ATTY: I agree.

ALJ: They're both in the record and I guess where I have to spend my work - my time doing is to try and tease out drug and alcohol materiality.

ATTY: And we tried to do that with testimony to show that she has indeed been clean for over a year and six months.

ALJ: You did an excellent job.  I'll study it hard....

(R. 304).

\*    \*    \*

Based on the foregoing, the Court concludes that plaintiff has met her burden of establishing disability at step three of the sequential evaluation process.  Accordingly, she is entitled to judgment in her favor as a matter of law.


William L. Standish
United States District Judge


Date: October 19, 2006

34